No. 83-485

IN THE SUPREME COURT OF THE STATE OF MONTANA

1984

_____

S TATE OF MONTANA,

       Plaintiff and Respondent,

-vs-

JAMES D. HOLMES,

       Defendant and Appellant.

_____

APPEAL FROM: District Court of the Seventeenth Judicial District,
            In and for the County of Valley,
            The Honorable Nat Allen, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Moses Law Firm; Charles F. Moses argued, Billings,
        Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
        Judy Browning argued, Asst. Atty. General, Helena
        David L. Nielsen, County Attorney, Glasgow, Montana

_____

                Submitted:   April 19, 1984

                   Decided:   August 14, 1984

Filed: AUG 14 1984

*Ethel M. Harrison*

_____
                  Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

This case involves the theft of almost $200,000 worth of jet fuel from the old Glasgow Air Force Base, now the Valley Industrial Park. Appellant was convicted of the theft, sentenced to ten years with five suspended and ordered to pay $160,000 in restitution. This appeal follows.

The Glasgow Air Force Base is located approximately seventeen miles north of Glasgow, Montana. In 1969, the U.S. Air Force closed the base and let bids for general maintenance work to be done on the base. AVCO Corporation was the sucessful bidder and contracted with the Air Force to be the caretaker of the base. Defendant came to Glasgow as a manager with AVCO. AVCO did the maintenance work until 1972 when it lost its contract to Tumpane Corporation. Defendant then incorporated Montana Manufacturing, which operated on the base also, for several years. In 1976, Valley County purchased the base and incorporated Valley Industrial Park (VIP). Appellant helped negotiate this purchase and in November of 1976 was elected president and general manager of VIP. The County Commissioners of Valley County serve as the Board of Directors of VIP.

Several large underground fuel tanks are located on the base. The tanks which this action concerns were located below building 669. The pumping station for those tanks was located inside building 669. When the Air Force vacated the base in 1969 an inventory of the fuel tanks was done and the six tanks under building 669 were labeled "pickled." Pickling is a process by which the fuel tanks are emptied,

cleaned and filled with a mixture of caustic soda and water to prevent rusting. However in the spring of 1979, a VIP maintenance man discovered that four of the six tanks under building 669 had fuel in them. It is conceded that the fuel had been there since 1969, had been left there by the Air Force and existed to the ignorance of all concerned.

Appellant ordered that samples of the fuel be extracted from the tanks. VIP maintenance employees extracted samples from the four tanks and gave the samples to appellant. Appellant and another VIP employee took the samples to Wolf Point to be tested, and it was found that the fuel was usable JP-4 jet fuel. Appellant then ordered the fuel to be transferred to the tanks under building 649. The tanks and pump station under building 649 had been depickled earlier in the year and were being used to store fuel for Boeing. Boeing was using the base as a refueling stop for their training flights. Since the pumps in building 669 had been stripped of most of their parts, appellant ordered a new portable pump for this purpose which was purchased at VIP's expense. In early 1980, the approximately 200,000 gallons of fuel were pumped from building 669 to building 649 by VIP maintenance employees.

At approximately the same time, appellant informed the board of directors of VIP about the existence of the fuel. He told them Boeing was interested in purchasing the fuel but also said it would be very difficult to obtain insurance for the fuel. It is standard practice in the aircraft industry to obtain liability insurance in case bad fuel is sold and personal injuries or property damage result. The chairman of the board testified that he still told appellant

-3-

to market the fuel for VIP. The board pursued the possibility of obtaining insurance to sell the fuel, but when appellant was told insurance could be purchased for VIP he told the board that Boeing was no longer interested in buying the fuel. Later in 1980 appellant informed the board that he had sold the fuel and credited VIP's accounts with approximately $100,000, but because of the liability problem, it would not appear in their books.

Prior to this, while the pumping was being done, appellant tried to start his own fueling corporation. He first approached three maintenance employees of VIP and asked if they would be interested in forming a corporation to sell the discovered fuel. The employees testified that appellant told them the fuel belonged to VIP. They were also told to bank out of town and not make any purchases which would draw attention to themselves. The three men testified they declined the offer because they were uneasy about ownership of the fuel. Holmes then approached Leonard Lane, comptroller for VIP, who agreed to incorporate with Holmes to sell the fuel. The two incorporated Aero Fuels, Inc.

Appellant informed Boeing that he and some Glasgow businessmen had bought 200,000 gallons of JP-4 fuel on speculation and were willing to sell it. The fuel was sold to Boeing. The crew supervisor from Boeing telephoned Lane when he received the bill from Aero Fuels and asked Lane who Aero Fuels was. Lane informed him it was a group of Glasgow businessmen who had purchased the fuel. In all Boeing paid Aero Fuels over $194,000 for the fuel. The money was deposited in Aero Fuels' accounts in Billings, Great Falls

-4-

and Williston, North Dakota.

Appellant was charged by information on November 5, 1982 with the theft of the JP-4 fuel having a value of $194,098.88. The information stated that Valley County through VIP was the owner of the fuel, and the affidavit supporting the information stated ownership had been gained by virtue of a deed from the General Services Administration. Appellant pled not guilty and a trial date was set.

Prior to the trial, appellant moved to suppress evidence which was obtained by the prosecution prior to the information being filed. The prosecution had obtained appellant's bank records by means of investigative subpoenas and an order of seizure issued by Judge M. James Sorte. The motion to suppress was made on the basis that Judge Sorte did not have jurisdiction to issue the subpoenas because he presided over the District Court of the Fifteenth Judicial District and the crimes occurred in the Seventeenth Judicial District. The motion to suppress was denied.

A jury trial was held from May 16 to May 20, 1983, and appellant was found guilty. The court sentenced him to ten years with five suspended, and ordered that he make restitution in the amount of $160,000. This appeal follows.

Appellant raises the following six issues for our consideration:

(1) Did the District Court lack jurisdiction to hear the case and issue final orders as the presiding judge was retired Judge Nat Allen?

(2) Did the District Court err in denying appellant's motion to suppress?

-5-

(3) Did the District Court err in denying appellant's motion to dismiss on the grounds that there was a fatal variance between the charges presented and the case proven at trial?

(4) Did the evidence establish that the fuel was abandoned and that appellant, as finder, took possession?

(5) Did the State prove the necessary intent to sustain a theft conviction?

(6) Did the District Court err in its refusal to give certain of appellant's proposed instructions?

The first issue has already been disposed of by our decision in State ex. rel. Wilcox and Bradley v. The District Court of the Thirteenth Judicial District. (Mont. 1984), 678 P.2d 209, 41 St.Rep. 397. Judge Allen was called in under the constitutional power recognized in Wilcox, supra. Thus he properly assumed full jurisdiction over the case, including the power to issue final orders.

Appellant next contends the District Court erred in denying his motion to suppress the fruits of the investigative subpoenas and order of seizure issued prior to the filing of the information in this case. The order and subpoenas were issued by Judge James Sorte, who was presiding over appellant's trial on a previous criminal charge in the District Court of the Seventeenth Judicial District. Judge Sorte, who is the elected District Judge of the Fifteenth Judicial District, was called in by Judge Leonard Langen who is the elected District Judge for the Seventeenth Judicial District. Appellant argues that Judge Sorte did not have jurisdiction to issue the subpoenas or order of seizure, since he sits in the Fifteenth Judicial

-6-

District and the crime occurred in the Seventeenth Judicial District.

Appellant's contention is not well taken. Section 46-4-301, MCA, states:

> "Whenever the attorney general or county attorney has a duty to investigate alleged unlawful activity, any justice of the supreme court or district court judge of this state may cause subpoenas to be issued commanding the persons to whom they are directed to appear before the attorney general or the county attorney and give testimony and produce such books, records, papers, documents, and other objects as may be necessary and proper to the investigation." (Emphasis supplied.)

The plain language of this statute vests every district court judge with the power to issue investigative subpoenas with no jurisdictional limitation. There simply is no requirement, explicit or implicit, that the subpoena be issued by the sitting judge of the district where the crime allegedly occurred. Appellant has read the venue statutes into section 46-4-301, MCA, which basically provide that a criminal trial shall be held in the county where the offense was committed. See section 46-3-101, MCA et. seq. He thus concludes that if the subpoena was issued by anyone other than the district court judge sitting in the county where the offense allegedly occurred, it was issued by a judge without jurisdiction. However there is a considerable difference between venue and jurisdiction. "The jurisdiction of the judges of the district courts of the State of Montana. . . [is] coextensive with the boundaries of the State of Montana. . ." Section 3-5-312, MCA, (Emphasis supplied). "Jurisdiction is the authority to hear and determine a cause. Venue is the place of trial."

-7-

Stanton Trust and Savings Bank v. Johnson (1937), 104 Mont. 235 at 238, 65 P.2d 1188 at 1189. Jurisdictional authority is granted by law. State ex rel. Johnson v. District Court (1966), 147 Mont. 263, 410 P.2d 933. There is no venue problem here because the subpoenas were issued before the information was even filed. The jurisdictional power or authority to issue investigative subpoenas is granted by law through section 46-4-301, MCA. Since the jurisdiction of each district court is coextensive with the boundaries of the state, so is the power of each district court to issue investigative subpoenas coextensive with the boundaries of the state.

Appellant next contends that there was a fatal variance between the information and the State's proof at trial, which requires the charges be dismissed. The basis of this contention is that while the affidavit in support of the information alleged that VIP owned the fuel by virtue of a deed from the U.S. Government, at trial they attempted to prove ownership by possession.

Generally, the information charging a party with a crime must state, "[T]he facts constituting the offense in ordinary and concise language and in such a manner as to enable a person of common understanding to know what is intended." Section 46-11-401(1)(c)(iii). The allegations contained therein and the proof must correspond for the defendant to be properly convicted. State v. Rindal (1965), 146 Mont. 64, 404 P.2d 327. This rule was developed to protect the defendant from being misled at trial and twice prosecuted for the same crime. Rindal, supra. Unless the variance between the allegations and proof prejudice a

substantial right of the defendant, the charge should not be dismissed.  Section 46-11-403(3), MCA.

Appellant claims he was prejudiced by the State's reliance on proof of ownership by possession rather than proof of ownership by title as alleged in the affidavit supporting the information.  He argues this was a shift in theory which did not allow him to adequately defend the charge.  This argument is not persuasive.  Ownership by title is not required under the criminal statutes of Montana.  The definition of owner which is applicable in this case is contained in section 45-2-101, MCA:

> "(46) 'owner' means a person other than the offender who has possession of or any other interest in the property involved, even though such interest or possession is unlawful, and without whose consent the offender has no authority to exert control over the property."

Under this definition, the State was required only to prove that VIP had possession of the fuel.  As discussed above, the fuel was found in VIP-owned tanks, and VIP exercised control over it through its employees, including the appellant.  The proof is clearly sufficient to establish that VIP had possession of the fuel and without VIP's consent, the appellant had no authority to exert control over the fuel.  That meets the definitional requirements of section 45-2-101(46), MCA.

As noted above, the purpose of requiring the proof to correspond with the allegations is to protect the defendant from being misled at trial and from being prosecuted twice for the same offense.  Rindal, supra.  Any change made by the State here did not prejudice appellant's defense or mislead him.  At trial, appellant contended the fuel was

abandoned by the federal government, and rightfully found by him. This defense theory was based on the acts of appellant himself and depended in no way upon the method VIP obtained ownership of the fuel. The focus was on abandonment of the fuel or how it was disposed of, rather than on how VIP obtained it. Likewise, the possibility of a subsequent prosecution for theft of the same fuel is not present here. Ownership of the fuel has been sufficiently established in VIP to alleviate this danger. In sum, any variation between the proof and the information is minor and does not require dismissal of the charges. No substantial right of appellant has been prejudiced.

Appellant next contends that the fuel was abandoned by the U.S. Government which appellant was entitled to find and sell for his own profit. In its best light, this interpretation of the facts is specious. In its worst light it could be termed blatantly misleading. Appellant contends that the U.S. Government abandoned the fuel because it had no intention of going back for it. However, abandonment must be of a known right. Hilyard v. Engel (1949), 123 Mont. 20, 209 P.2d 895. Appellant's own witnesses establish that the Air Force did not know the fuel existed, so it was not a known right they relinquished. Also, even if the fuel was abandoned, the VIP employees found the fuel in VIP owned tanks and exercised control over it, not appellant himself. The VIP maintenance men found the fuel. They withdrew samples, and appellant along with a co-worker took the fuel to be tested at a cost of almost $800 to VIP. The pump which was purchased to move the fuel was bought by VIP at a cost of over $600. VIP employees moved the fuel to

different tanks. Appellant's assertion that VIP may have a civil action against him for the cost of these services misses the point. The point is that VIP through its employees, including appellant acting as a VIP employee, took control over the fuel. Appellant's abandonment theory is not borne out by the uncontradicted facts of the case.

The next issue concerns appellant's intent; two errors are alleged here. First, appellant argues that the District Court erred by not instructing the jury that they must find a bad or evil intent on his part to convict him. Second, he asserts that the facts will not bear out such a finding.

This Court has often held that giving instructions on intent using the statutory definitions of "knowledge" and "purpose" eliminates the need for further intent instructions. State v. Klein (1976), 169 Mont. 350, 547 P.2d 75, and State v. Jackson (1979), 180 Mont. 195, 589 P.2d 1009. Here the District Court did exactly that, and correctly refused appellant's offered instructions on evil intent. Whether the evidence would have been sufficient to find an evil intent or not is inconsequential. The jury was properly instructed and resolved this question of fact against appellant. There is clearly sufficient evidence to support this finding.

Finally, appellant points to twenty one proposed jury instructions he contends were improperly refused. We have reviewed the proposed instructions submitted by appellant and compared them with those given by the trial court. The instructions given as a whole, accurately and fairly state the law, which is consistent with the requirements of this Court. State v. Anderson (1976), 171 Mont. 188, 557 P.2d

795. Appellant has failed to show how not giving these instructions prejudiced him in any way. The District Court properly refused them as repetitious and as comments on the evidence.

Affirmed.

_John Conway Harrison_
Justice

We concur:

_Frank I. Haswell_
Chief Justice

_[signature]_

_L.C. Gulbrandson_

_[signature]_

_John C. Sheehy_

Justices